[Civ. No. 19741. Third Dist. Apr. 30, 1982.]

ENVIRONMENTAL PLANNING AND INFORMATION COUNCIL OF WESTERN EL DORADO COUNTY, INC., Plaintiff and Appellant, v.
COUNTY OF EL DORADO et al., Defendants and Respondents; CITIZENS FOR SENSIBLE GROWTH et al., Interveners and Respondents.

COUNSEL

Reed & Samuel, James S. Reed, Michael H. Remy and Tina A. Thomas for Plaintiff and Appellant.

David E. Whittington, County Counsel, and Robert A. Laurie, Chief Assistant County Counsel, for Defendants and Respondents.

Allen, Maloney, Moss, Meyer & Sample and Hefner, Stark & Marois for Interveners and Respondents.

OPINION

**REYNOSO, J.**\*—Environmental Planning and Information Council of Western El Dorado County, Inc., appeals from an adverse judgment on its petition for a writ of mandate and complaint for injunctive relief. Appellant had sought to set aside the El Dorado County Board of Supervisors' (Board) adoption of amendments to its general plan, arguing that the environmental impact reports (EIRs) prepared for use in considering such amendments were inadequate under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

The dispositive issue on this appeal is whether the requirements of CEQA are satisfied when the EIRs prepared for use in considering amendments to the county general plan compare the environmental impacts of the proposed amendments to the existing plan rather than to the existing environment. We hold that the EIRs must report on the impact of the proposed plans on the existing environment. Since we find that the EIRs in this case are inadequate for this purpose we reverse the judgment.

*Assigned by the Chairperson of the Judicial Council.

## I

In 1978, the Board adopted the "Greenstone" and "Camino-Fruitridge" area plans as amendments to the county's 1969 general plan and certified that the final EIRs for each of the two area plans had been prepared in compliance with CEQA. Appellant petitioned the superior court for a writ of mandate to set aside the Board action on the ground, inter alia, that the two EIRs were inadequate.

The trial court agreed with appellant that the EIRs were inadequate, finding that they "should have included comments to the letters received from the general public" and "should have made findings regarding mitigation measures of the significant [environmental] effects." The court further held that the county "should have prepared supplemental EIRs to respond to the changes made in the plans by the Board of Supervisors." The court accordingly issued a writ of mandate.

The county responded to the writ of mandate by preparing supplemental EIRs for the Greenstone and Camino-Fruitridge area plans. On August 1, 1979, the Board held a public hearing to consider the plans in light of the revised EIRs. The Board again adopted the plans and certified that the revised EIRs complied with CEQA.

Appellant filed a supplementary petition for writ of mandate and complaint for injunctive relief contending that the supplemental EIRs were inadequate. The trial court held that the previous deficiencies were cured by the supplemental EIRs and denied the writ and request for an injunction. Appellant seeks reversal of the ensuing judgment.

## II

In interpreting the requirements of CEQA we begin, as we must, with the words of the statutes. The Legislature expressed its intent: "It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." (Pub. Resources Code, § 21000, subd. (g), as amended by Stats. 1979, ch. 947, § 4, p. 3270.) The policy of the state was to "ensure the long-term protection of the environment." In order to achieve the enumerated objectives

of CEQA, the Legislature mandated preparation (in instances such as the case at bench) of EIRs to provide a detailed statement of "[t]he significant environmental effects of the proposed project" (Pub. Resources Code, § 21100, subd. (a), as amended by Stats. 1976, ch. 1312, § 16) on the "physical conditions which exist within the area" (Pub. Resources Code, § 21060.5, defining "environment").

The purposes served by the EIR have been variously explained. The principal purpose, all writers seem to agree, is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; ..." (Pub. Resources Code, § 21061.) The court in *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260], put it this way: "In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision." But public decision makers, too, need the information. EIR's are "...to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Cal. Admin. Code, tit. 14, § 15150 (hereafter Guidelines). ██ The EIR serves both the public officials and the public: they are "to inform other government agencies, and the public generally, of the environmental impact of a proposed project ... and to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66].)

With the statutory and case law in mind we return to the original legal question: does CEQA generally, and the standards for preparation of EIRs in particular, compel agencies to assess environmental impacts of a proposed general plan amendment by comparing the proposal with the actual conditions in the area? To ask the question, after the above analysis, is to answer it. ██ CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan; it concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area. The legislation evinces no interest in the effects of proposed general plan amendments on an existing general plan, but instead has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate.

The courts, of course, have so recognized: "[W]e conclude that the Legislature intended the [C]EQA to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) "The highest priority must be given to environmental considerations in interpreting the statute." (*Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96].) "In determining environmental impact, agencies must consider the effect of the project on the environment." (*Clinton Community Hosp. Corp.* v. *Southern Md. Med. Ctr.* (D.Md. 1974) 374 F.Supp. 450, 456-457.)

### III

With the legal requirements of CEQA in mind we turn to a consideration of the adequacy of the particular EIRs involved in this appeal. ■ Our role as a court in this inquiry is well-established. We do "not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. [Citations.]" (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal. App.3d 185, 189 [139 Cal.Rptr. 396].) Judicial intervention is appropriate only where there has been an abuse of discretion, which will be established if the county has not proceeded in a manner required by law or where the county's decision is not supported by substantial evidence. (Pub. Resources Code, § 21168.5; *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at p. 74.) Of course, if the EIRs in this case fail to report upon the potential environmental impacts of the Greenstone and Camino-Fruitridge area plans on the existing environment, then the county has not proceeded in a manner required by law.

### A. *The Greenstone EIR*

■ A review of the Greenstone area plan EIR clearly shows that the thrust of the EIR is to compare the proposed plan with the existing general plan. The introductory "Project Environmental Summary" notes: "Based upon the supporting environmental and socio-economic information, the Plan significantly reduces the potential population capacity as compared to the existing plan capacity." (Greenstone area plan & EIR, p. v.) The supplemental EIR includes the following:

### "IRREVERSIBLE ENVIRONMENTAL CHANGES

"The Greenstone Plan and the modification provides for a total population projection of approximately 5800. Total housing units projected for the Greenstone area is approximately 1705. The anticipated build-out date is the year 2032 if maximum zoning classification is realized.

"The Greenstone Plan drastically reduces population holding capacity from 70,400 as per the existing General Plan to a population holding capacity of approximately 5800.

"Realization of the Greenstone Plan will generate and direct growth in certain areas. The Plan is committing specific lands to the irreversible environmental changes due to development."

The rest of the EIR continues in the same manner. The section on "Growth Inducting Impact" simply refers the reader to page 55 of the original Greenstone Plan and EIR which "adequately discuss[es] growth inducing impacts." In turn page 55 of the EIR reads as follows respecting that concern:

### "GROWTH INDUCTING IMPACT

"Implementation of the proposed Area Plan and subsequent specific zoning will tend to direct growth into areas where the least environmental damage will occur. Growth inducement could result within the Plan Area upon completion of this project in that there are many buildable parcels which will continue to have that potential under this new plan. The overall Plan can be looked at as generating a net decrease in growth inducement with respect to the existing General Plan. The overall holding capacity of the proposed Plan will be reduced and, therefore, the extent of development will be likewise decreased."

We note further the portion of the final EIR which deals with air quality. The report reads: "The total population at saturation under the existing General Plan would be 70,402. Under the Proposed Plan, it would be 4,303. This is a 94% reduction in density. This is approximately .75 persons per acre. [¶] Staff does not feel that this will have an unfavorable effect on air quality."

## B. *The Camino-Fruitridge EIR*

Like the Greenstone EIR, the Camino-Fruitridge EIR has as its thrust a comparison of the proposed area plan to the existing general plan. In adopting the plan the Board found: "3. There may be cumulative impacts resulting from an increase in population within certain areas of the Plan which may not be capable of being wholly mitigated. In this regard there are nevertheless economic and social concerns which require that the project be approved; specifically, when balancing the benefits of this project which reduces total population potential in the area and provides for a reasonable but limited growth rate as desired by the majority of the community against potential unmitigated impacts which may result from the long-term cumulative effects of increased housing, this Board determines that it is in the best interest of the community to approve the project having mitigated the environmental damage to the greatest extent possible."

The entire thrust of the EIR may be summarized in the words of the summary of environmental review: "The proposed plan establishes a population holding capacity of 22,440 while the existing plan provides a population holding capacity of 63,600. A substantial population reduction is then realized." Likewise, the supplemental EIR notes that the proposed amendment reduces the population holding capacity of the general plan and concludes: "Intutively [*sic*] a population reduction of 65% would decrease any potential impacts by the same percentage."

## C. *Conclusion*

These examples we have cited from the Greenstone and Camino-Fruitridge EIRs are not all inclusive but are merely illustrative of the manner in which the EIRs were prepared. It is true that the reports do discuss certain physical impacts upon the existing environment, but such information must be painstakingly ferreted out of the reports. The comparisons, we have seen, are always between the existing general plan and the proposed amendments.

The deficiency of the EIRs is manifest when the existing environment is compared to the general plan. The existing general plan designates population capacities of over 63,000 for the Camino-Fruitridge area and over 70,000 for the Greenstone area. In contrast, the proposed amendments designate population capacities of 22,440 for the Camino-

Fruitridge area, and 5,800 for the Greenstone areas, both substantial reductions. The comparisons, however, are illusory, for the current populations of those areas are approximately 3,800 for the Camino-Fruitridge area and 418 for the Greenstone area. The proposed plans actually call for substantial increases in population in each area rather than the illusory decreases from the general plan.

The comparisons utilized in the EIRs can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts which would result. There are no extensive, detailed evaluations of the impacts of the proposed plans on the environment in its current state. Accordingly, the EIRs fail as informative documents.

The judgment is reversed and the cause remanded to the trial court with directions to issue a writ of mandate in accordance with the views expressed herein.

Carr, J., concurred.

PUGLIA, P. J.—I agree with the major premise of the court's opinion but not with its application to these facts. I concur with the majority's conclusion that an environmental impact report (EIR) as an informative document must include an appraisal of the impacts of the proposed plan upon present conditions in the plan area. I dissent because, contrary to the majority, my review of the two EIR's convinces me that each complies with that imperative.

The majority concludes that the "thrust" of the two EIR's is comparison of the proposed area plans with the theoretical conditions authorized by but unrealized under the existing plans. In support of this hypothesis, the majority extracts snippets from each EIR in which is stated the historically incontrovertible fact that the proposed plans contemplate a significant reduction in the population holding capacity of each area below that presently authorized by the existing plans. Abruptly dismissed as "information [which] must be painstakingly ferreted out of the reports" (maj. opn., p. 357, *ante*) are the comprehensive treatments of plan impacts and mitigation measures relating to present conditions of soil, geology, hydrology, vegetation, wildlife, air quality, water quality, esthetics and historical and archaeological sites. The discussion of growth inducing impacts is specifically singled out and criticized by the majority for its reference to the substantial theoretical

population reductions effected by the new as compared to the old plans. Brushed aside is the express acknowledgement that under the new plans actual growth "could result within the Plan Area[s] upon completion of [these] project[s] in that there are many buildable parcels which will continue to have that potential under [these] new plan[s]."

The majority's utter disregard of the very substantial portions of the two EIR's which deal with the present condition of the environment suggests that any reference to the existing area plans will render future EIR's vulnerable to rejection. However, an EIR must describe all reasonable alternatives to the project including the specific alternative of "no project" (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal. App.3d 185, 200, 203 [139 Cal.Rptr. 396]). Although the "no project" alternative here is continuation of the existing area plans, it is the very mention of that alternative which inexplicably provides the occasion for the reversal of this judgment.

Since the board of supervisors was under no misapprehension as to the "thrust" of these two EIR's, I suspect the members will react with bewilderment and frustration to a reversal and remand premised on the "failure" of these EIR's to deal with present environmental conditions. Excerpts from the hearings before the board which culminated in approval of the new area plans demonstrate that their scope was accurately portrayed:

"LAURIE [county counsel]: Okay, and further, in recognizing that the [Greenstone area plan] does, in fact, result in a lesser density ... doesn't the Environmental Impact Report also recognize that there will be an increase in density over what there is, as of today?

"RAPER [county planner]: Yes, sir. That is correct. The EIR indicates that the present population is approximately 560 persons, the estimated population is approximately 580. The mitigation measures that are contained in the Draft EIR, identify those construction activities that may occur and result in impact upon the plan area itself. That is why mitigation measures are incorporated within the Draft EIR itself.

"LAURIE: Is it then, safe to say, that on the one hand, the EIR does recognize that the project results in a lesser density, that it also, recognizes that there will be an increase in population over what there is today and offers mitigation measures for those impacts?

"RAPER: That's correct. *If staff and Board took the position that the reduction in population was the main factor in this hearing, then it would be more appropriate to issue a negative declaration than to continue on with the EIR.* And, to me, the staff and the Board recognized the activity and did prepare an EIR to recognize the development activities resulting for the plan area itself. . . ." (Italics added.)

The following is extracted from the board hearing of the Camino-Fruitridge area plan:

"LAURIE: Mr. Raper, as in Greenstone, the EIR recognizes that this project results in a decreasing density from the present area plan, is that . . . ?

"RAPER: That is correct. Again, by State law, we have to consider alternative projects and, again, if the project area plan was not adopted, or if no project was considered, the 1969 General Plan would be still effective.

"LAURIE: And, the EIR also recognizes, though, does it not, that under the plan, as proposed, there would be an increase in population over what is present today?

"RAPER: That's correct. That's why the mitigation measures and potential impacts are identified in the EIR.

"LAURIE: So those mitigation measures *do* pertain to the proposed increase in population over what exists today?

"RAPER: That's correct." (Italics in original.)

The trial court also had no difficulty identifying the scope and intent of these EIR's. In denying appellant's petition for writ of mandate, a finding was made that these EIR's "did review the potential impact of the proposed plans as they related to the conditions existing today." These EIR's constitute substantial evidence in support of that finding.

An EIR is but a means to achieve orderly, balanced and rational planning and development through informed public participation in the decisional process. In its opinion the majority unfortunately subordi-

nates the function of an EIR as an informational document to a sterile formalism in which doctrinal purity assumes decisive importance.

I find no abuse of discretion in denial of the petition for writ of mandate. I would affirm the judgment.

A petition for a rehearing was denied May 28, 1982, and the opinion was modified to read as printed above. Puglia, J., was of the opinion that the petition should be granted. The petition of defendants and respondents for a hearing by the Supreme Court was denied June 30, 1982. Reynoso, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.