[Civ. No. 30168. Fourth Dist., Div. Three. Aug. 22, 1983.]

EUGENE R. ATHERTON, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF ORANGE COUNTY,
Defendant and Respondent.

348

**COUNSEL**

Eugene R. Atherton, in pro. per., for Plaintiff and Appellant.

Adrian Kuyper, County Counsel, and John R. Griset, Deputy County Counsel, for Defendant and Respondent.

OPINION

**SONENSHINE, J.**—By resolution, the Orange County Board of Supervisors approved an environmental impact report (EIR)[1] covering the proposed Foothill Transportation Corridor. The corridor consists of numerous potential transportation routes through southern Orange County which would link Interstate 5 south of San Clemente with the Riverside Freeway (SR-91) near the Riverside-Orange County line. Although the major emphasis of both the EIR and the board's resolution was a multilane freeway, the EIR examined alternative modes of transportation including light rail. The board, by certifying the EIR, amended the transportation element of the general plan to include the Foothill Transportation Corridor.

Appellant sought a writ of mandate seeking to annul the board's certification of the EIR and adoption of the corridor amendment arguing the EIR was deficient with respect to its discussion of various topics and the board failed to follow procedures required by law. Following denial of the writ of mandate without prejudice,[2] this appeal followed.

I

█ " 'An express purpose of CEQA is that state agencies give "major consideration" to preventing damage to the environment when conducting their regulatory functions. (Pub. Resources Code, § 21000, subd. (g).) To accomplish this, an environmental impact report is required to be written prior to a project's approval. (§§ 21100, 21151.) The EIR identifies significant effects of a project on the environment, the way those effects can be mitigated or avoided, and the alternatives to the project. (§ 21002.1, subd. (a).) It is "an informational document which . . . will inform public decision-makers and the general public of the environmental effects of projects they propose to carry out or approve." (Cal. Admin. Code, tit. 14, § 15012.)' " (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1026-1027 [185 Cal.Rptr. 41].) (Fns. omitted.)

█ " 'In reviewing the [board of supervisors' actions], we are limited to deciding "whether there was a prejudicial abuse of discretion [which] is established if the agency has not proceeded in a manner required by law or

---

[1]The heart of the California Environmental Quality Act (CEQA) is the environmental impact report. (Pub. Resources Code, § 21000 et seq. and Cal. Admin. Code, tit. 14, § 15000 et seq.)

[2]Although the trial court, in its intended decision, purported to deny the writ of mandate without prejudice as having been brought prematurely, we accept respondent's suggestion and decide this appeal on the merits. (Cal. Rules of Court, rule 232(a).)

if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Thus, we do "not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) However, we must be satisfied that the [board] has fully complied with the procedural requirements of CEQA, because only in this way "can a subversion of the important public purposes of CEQA be avoided." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)'" (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d 1022, 1027.)

■ Appellant presents a broad-based attack upon the adequacy of the EIR as it addressed the various environmental effects of the proposed corridor. In shotgun fashion he complains the report failed to deal with air pollution (acidity), light rail transit, ridesharing, alternative routes, flood control and maintenance of open space reserves.

"One of the required features of an EIR is a 'detailed statement setting forth . . . [a]lternatives to the proposed project.' (§ 21100, subd. (d).) The Guidelines state that 'all reasonable alternatives' should be described, including the 'no project' alternative. (Guidelines, § 15143, subd. (d).)" (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d 1022, 1027.)

Contrary to appellant's position, the EIR did address each of these topics. Although in many instances the EIR's discussion and supporting data were general and vague,[3] this was a result of the conceptual nature of the proposed project. The corridor consists of a wide area of land containing everything from mountainous terrain with 30 percent grades to flats crossing water courses. A number of potential routes were considered in addition to evaluating various forms of transportation. Thus the EIR evaluated everything from a light rail train to an eight-lane freeway running on as many as four separate and distinct paths.

Although environmental documents should be prepared as early as feasible in the planning process to enable environmental considerations to influence project design (Cal. Admin. Code, tit. 14, § 15013, subd. (b)),[4] the degree of specificity required in an EIR should correspond to the degree of specificity involved in the underlying activity which the EIR describes.

---

[3]For example, the EIR discussed in detail the environmental impact of the disruption and modification of water courses including heightened flood potential. Until a route is selected for further study and the mode of transportation chosen, specific impacts and mitigation measures are purely speculative.

[4]Hereinafter referred to as Guidelines.

(Guidelines, § 15147, subd. (a).) The amendment of the county's general plan to include the Foothill Transportation Corridor represents a conceptual proposal. Once the board proposes the route and mode of transportation, subsequent environmental impact reports will be necessitated by the substantial changes to the transportation element of the general plan before the project is approved.[5] (Pub. Resources Code, § 21166.)

"While it is clear that the requirements of CEQA 'cannot be avoided by chopping up proposed projects into bite-sized pieces' which, when taken individually, may have no significant adverse effect on the environment (*Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96]), it is also true that where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences. (*Topanga Beach Renter's Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 196 [129 Cal.Rptr. 739].)" (*Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851, 854-855 [139 Cal.Rptr. 176].) We conclude, after a review of the record, the EIR adequately confronted the environmental concerns and issues presented by the project as it is *presently envisioned.* (*Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424, 435, fn. 6 [187 Cal.Rptr. 53]; *Brentwood Assn. For No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 502 [184 Cal.Rptr. 664].)

II

We now turn to the sufficiency of the board's findings. The EIR identified numerous significant effects on the environment arising from the proposed Foothill Corridor. These included loss of habitat for animals, loss or destruction of archeological and paleontological sites, loss of open space and potential flooding. No project may be approved or carried out where a significant environmental impact has been found unless the agency makes one or more findings: "(a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. [¶] (b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency. [¶] (c) Specific economic, social or other considerations make infeasible the mitigation measures or project alternatives identified in the environmen-

---

[5]Respondent conceded at oral argument subsequent EIR(s) will be required as the project becomes specific. Nothing in our decision today limits the matters which may be considered at that time.

tal impact report." (Pub. Resources Code, § 21081.) "Guidelines section 15088, subdivision (a) requires there be a finding or findings for each significant effect and that each finding be written and be 'accompanied by a statement of the facts supporting each finding.'" (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d 1022, 1032.)

In *Village Laguna,* the Second Division of this court found the practice adopted by the Orange County Board of Supervisors in approving an identical EIR and general plan amendment to be violative of Public Resources Code section 21081. Specifically the court found the utilization of a conclusionary statement that the alternatives were "economically infeasible" did not constitute "a statement of facts" necessary to fulfill CEQA's mandate that the agency's thinking process be disclosed.[6] "The conclusionary, almost boilerplate language of the findings is insufficient evidence that such balancing [environmental consequences versus benefit] occurred." (*Id.,* at p. 1035.)

In approving the EIR and amending the general plan, the board listed 13 separate and significant environmental effects which were identified by the EIR. In each category, the board found the effect could not be reduced to insignificant levels and that mitigation was infeasible. The board did not evaluate the environmental effects when compared to proposed alternatives, nor did it make findings as to what measures could be undertaken to mitigate the effects of the project. "The writing of a perfect EIR becomes futile action if that EIR is not adequately considered by the public agency responsible for approving a project. Indeed, it is almost as if no EIR was prepared at all. In the present case, there is no evidence that the board ever consid-

---

[6]For example, under Cultural and Scientific Resources the Resolution states:

"(1) The corridor has the potential to destroy or displace archaeological resources depending on the specific route chosen. It appears that Alignment A of the northern El Toro Preliminary Alignments would disrupt five known archaeological sites; Alignment B potentially could impact four known archaeological sites; and Alignment C could disrupt one known archaeological site. Not all of the northern El Toro area has been surveyed. Therefore, additional, though currently unknown, sites could be affected adversely.

"(2) Ninety-five percent of the transportation corridor has yet to be surveyed. Therefore, the potential for new paleontological sites is high. As a result, there is the possibility of long costly delays in construction of the corridor from the excavation of existing and/or discovered sites. Of the northern El Toro Preliminary Alignments, Alternative A encounters six known paleontological sites while Alternative B encounters three known sites and Alternative C encounters five known paleontological sites.

"(3) The corridor has the potential to disrupt historical resources and in the most extreme cases, removal of the site may be necessary.

"Certain measures have been proposed which would minimize the impacts on known archaeological resources, known or expected paleontological resources, and known historical resources. However, these measures will not save any of these resources in the way of actual roadway construction or these resources whose location will be exposed to the public, subjecting them to loss by theft. These impacts are considered unavoidable adverse impacts."

ered any EIR alternative to the project. . . ." (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d 1022, 1035.)

The judgment is affirmed only insofar as it denies appellant's application for a writ of mandate commanding the board set aside its certification of the EIR. The judgment of the superior court respecting the findings of the board is reversed and the cause is remanded for issuance of the writ of mandate. Appellant to recover his costs on appeal.

Wallin, J., concurred.

**CROSBY, Acting P. J.,** Concurring and Dissenting.—I agree with part II of the majority opinion but must respectfully dissent from the conclusion of part I that this EIR is adequate under applicable CEQA standards.

There is no question that an EIR must support the amendment to the transportation element of the county general plan we review here. (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 795-798 [187 Cal.Rptr. 398, 654 P.2d 168]; *Edna Valley Assn.* v. *San Luis Obispo County etc. Coordinating Council* (1977) 67 Cal.App.3d 444 [136 Cal.Rptr. 665].) Although preliminary to governmental decisions which might actually have physical impacts on the environment, an EIR is mandated because the amendment constitutes an essential step in a process which may ultimately lead to that result. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017].) That notion is well settled, and the county has generated a document of considerable weight in its effort to comply.

The difficult problem is whether the EIR is adequate for its purpose in a particular case. I do not believe this one is. Above all, CEQA is intended to require decisionmakers to face environmental concerns, and the EIR is the core of the process. (*Friends of Mammoth* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Citizens of Lake Murray Area Assn.* v. *City Council* (1982) 129 Cal.App.3d 436, 440 [181 Cal.Rptr. 123].) The decisionmakers have much to face here. The proposed Foothill Corridor traverses 26-plus miles of largely open space between the Riverside Freeway and the San Diego County line south of San Clemente. The EIR concedes, "(1) Corridor alignment through biologically sensitive areas will substantially impact resident fauna and degrade existing habitat. Rare and endangered species may be impacted. Biologically sensitive areas within the corridor study area which may be unavoidably impacted depending on the alignment chosen, include upper Cristianitos Canyon in Subarea F and the Gypsum-Weir-Blind Canyon watersheds in Subarea A. The Limestone Canyon and Santiago Canyon watershed will be adversely impacted by an inland

alignment within the corridor. [¶] (2) Wildlife pathways and habitats in major drainages crossed by the corridor will be moderately impacted by traffic noise, pollutant runoff and by physical structures such as culverts or bridge supports. Drainages impacted in this manner include Santiago Creek, Arroyo, Trabuco, San Juan Creek, Aliso Creek and tributaries to San Diego Creek. [¶] (3) One thousand six hundred acres of various habitat types will be physically removed during road construction. [¶] (4) The biological integrity of all areas adjacent to the selected alignment will be impacted by noise, air pollutants and hydrocarbon and heavy metal runoff. [¶] (5) The corridor and its protective fencing will limit regional movement of animals except for larger birds. [¶] Measures have been proposed which would partially mitigate the impacts of the transportation corridor on existing flora and fauna, rare and endangered species, and wildlife pathways. However, these measures may not reduce these impacts to significant [*sic*] levels."

In addition to merely putting decisionmakers on notice, CEQA also aims to ". . . (2) [i]dentify ways that environmental damage can be avoided or significantly reduced, [and] [¶] (3) [p]revent significant avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible, [and] [¶] (4) [d]isclose to the public the reasons why a governmental agency approved the project in the manner the agency chose." (CEQA Guidelines, § 15010.) We have already found that the decisionmaking process in the adoption of the EIR has run afoul of part (4) above.

I would find the EIR is also inadequate in view of parts (2) and (3) and violates the declared policy of this state to "[p]revent the elimination of fish or wildlife species due to man's activities, insure that fish and wildlife populations do not drop below self-perpetuating levels, and preserve for future generations representations of all plant and animal communities and examples of the major periods of California history [and] [e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." (Guidelines, § 15011, subds. (c) and (d).)

The Director of the California Department of Fish and Game, in a letter dated May 27, 1981, which is incorporated in the EIR, warned, "We cannot concur with the project as written; however, Alternative 1 would meet with our approval if major mitigation actions are accomplished. [¶] We find that the Draft EIR provides a generally acceptable assessment of primary impacts to natural resources including flora and fauna. We did not have the opportunity to review the technical appendix because it did not accompany

the document.[1] Therefore, we do not know if there was any assessment of the secondary effects of the project. We believe that the proposed mitigation measures to offset project impacts, although somewhat extensive, only approach the real needs in a superficial way. They thus fail to offset the direct, indirect, and cumulative impacts of urban encroachment that would follow construction of a major highway through the presently undeveloped lands. [¶] It is our opinion that the construction of a highway through the inland areas of Orange County and such development of major metropolitan airport as is under study for Santiago Canyon would be highly likely to induce urban growth. The impacts from construction of these developments would result in extensive losses of biotic resources in addition to the recognized 1,600 acres of direct loss of wildlife habitat due to construction of the highway. All of this would occur without providing substantial and long-lasting mitigation or compensating benefits to flora and fauna. We firmly believe that major mitigative measures must be provided that will result in replacement or preservation of significant acreages of natural open space in perpetuity and provide for their maintenance in the public's interest and to enable continued public enjoyment of the biotic amenities of Orange County. [¶] To this end, we recommend that provisions be added to the concept of this project that would provide for the preservation of natural habitat through acquisition of significant, large acreages as mitigative action. We also recommend that the County provide for studies to identify appropriate land acquisition sites. It should include measures enabling this mitigation program to reach successful conclusion."

The mitigation measures found in the EIR and deemed "superficial" by the director can be summarized as follows: (1) a route will be selected which, if possible, will avoid removal of woodlands, grasslands, sensitive areas, and habitats of rare or threatened species; (2) construction will occur when raptors are not nesting; (3) streambed alteration will be minimized; (4) high bridges over significant woodlands, wildlife populations and movement corridors will be considered; (5) care will be taken during construction, and after, to minimize pollution and damage to vegetation and to revegetate where necessary. Despite the director's perceptive comments, the EIR reflects no effort to satisfy his concerns.

The introduction of a massive concrete ribbon through a wilderness area and the enormously destructive activity which will be associated with its construction will obviously impact what little remains of Orange County's wildlands in a major way; and the EIR's mitigation proposals do address,

---

[1]That the Director of the Department of Fish and Game was not provided with the appendix is startling to say the least. It contains, among other things, a detailed, 68-page study entitled "Biological Resources of the Foothill Transportation Corridor." A review of its contents could only have fortified his expressed views.

if not completely answer, this rather obvious fact. But the concerns of the Director of the Department of Fish and Game reflect an understanding the EIR does not. The greater threat to the environment is the inevitable growth and development of the area surrounding the corridor. The EIR does not address mitigation in that sense or even assess the director's suggestions concerning it.

In approving the EIR, the board of supervisors found, in part, as follows: "The resources stated below are determined to be of overriding value which negate all of the above unavoidable adverse impacts: [¶] a. Adoption of the Foothill Transportation Corridor would permit initiation of subsequent studies to define more precisely the location and design of the transportation facility. [¶] b. Adoption of the Foothill Transportation Corridor would pave the way to respond to an identified need or a major arterial highway/transportation route in the foothills of the Santa Ana Mountains generated by existing and approved land use. [¶] c. Adoption of the Foothill Transportation Corridor and subsequent construction would fulfill an additional link as proposed in the Multi-Modal Transportation Study. [¶] d. Adoption of the Foothill Transportation Corridor and subsequent construction would help provide for a transportation system which would facilitate ingress and egress in an area not now open to the movement of people and goods; and that said movement will provide for the social and economic good of the people of Orange County, including improvement of the circulation system and provisions for housing and employment for the economic growth of Orange County. [¶] BE IT FURTHER RESOLVED that, in accordance with California Administrative Code, Title 14, Natural Resources, Division 6, Resources Agency, Chapter 3, Article 7, section 15089, this Board has balanced the benefits of the project and that the project outweighs environmental risks. This Board makes this Statement of Overriding Considerations prior to approval of amending the Transportation Element of the Orange County General Plan, Master Plan of Arterial Highways component." In other words, the county is prepared to anticipate the benefits of new housing, employment and economic growth at this stage (on what one can only assume will be a grand scale) and relies to an extent on those benefits to justify the conceded threat to the environment. The reverse side of that coin is, now is the time to comply with CEQA's mandate to explore mitigation alternatives on a similar scale. The legally mandated "cost of doing business" in this EIR is a plan to properly mitigate a concept which can only result in an environmental disaster for the County of Orange in its current form. (*El Dorado Union High School District* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 131-132 [192 Cal.Rptr. 480]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317].) By focusing on the corridor itself, the EIR fails

to propose mitigation methods essential to protect what will be left on each side. The judgment should be reversed in its entirety.

A petition for a rehearing was denied September 13, 1983, and appellant's petition for a hearing by the Supreme Court was denied November 16, 1983. Bird, C. J., was of the opinion that the petition should be granted.