[No. H002967. Sixth Dist. Mar. 24, 1988.]

TOWARDS RESPONSIBILITY IN PLANNING, Plaintiff and Appellant, v.
CITY COUNCIL OF THE CITY OF SAN JOSE, Defendant and Respondent;
KOLL COMPANY et al., Real Parties in Interest and Respondents.

COUNSEL

Bruce Tichinin and Tichinin & Mitchell for Plaintiff and Appellant.

Joan R. Gallo, City Attorney, and George Rios, Assistant City Attorney, for Defendant and Respondent.

Joseph P. Diciuccio, Patricia A. Welch, Howell & Hallgrimson, Norman E. Matteoni and Matteoni, Saxe & Nanda for Real Parties in Interest and Respondents.

## OPINION

**BRAUER, J.**—In this case a citizens' group, Towards Responsibility in Planning (TRIP), challenges decisions of the San Jose City Council (City) to rezone several properties in North Coyote Valley from agricultural to campus/industrial. The landholders, the Koll Company (Koll), Tandem Computers, Inc. (Tandem), and Sobrato Development Companies (Sobrato), who seek to develop their properties in conformance with the new zoning, are real parties in interest. TRIP's contentions are these:

1) The rezoning violated Government Code section 65030.2 in that City did not properly consider the fiscal implications of its actions;

2) The EIR for the rezoning was deficient in several respects; and

3) The rezoning violated the Open-Space Lands Act (Gov. Code, § 65560 et seq).

None of these claims has merit. We affirm the judgment of the superior court which had denied TRIP's petition for a writ of mandate.

### BACKGROUND

The process which culminated in the challenged zoning decisions began in 1982 when Koll and Sobrato submitted applications for redesignation of their lands from agricultural to campus/industrial under the City's general plan. City responded by establishing an "Economic Development Task Force" (the task force) to perform a comprehensive review of City's economic development program and to prepare recommendations on the specific parcels in Coyote Valley. The task force engaged in an extensive fact-finding effort in order to evaluate San Jose's industrial land inventory and to assess demand for large sites to accomodate high technology industry. The task force submitted its final report, dated April 22, 1983, in which it concluded that City would benefit by accomodating high technology

growth, that there was an insignificant number of large parcels which would be desirable to high technology companies, and that North Coyote Valley was one of the most feasible areas to consider for this purpose.

On May 12, 1983, the city council unanimously approved the final report of the task force and adopted a resolution amending the general plan to designate the Koll and Sobrato properties for campus/industrial use. Tandem purchased a portion of the Koll property subsequent to the general plan amendments.

A month later TRIP filed a petition for a writ of mandate in the superior court, seeking to set aside the general plan amendment. Judgment denying the petition was entered on August 10, 1984, and TRIP appealed. In due course the judgment was affirmed by the first appellate district in an opinion filed September 19, 1986. (*Towards Responsibility in Planning* v. *City Council* (Sept. 19, 1986) A029610.) (We will refer to this case as TRIP 1.)

Meanwhile, the property owners, which now included Tandem, applied for rezoning. A full EIR was prepared and two rounds of public hearings took place, before City's planning commission and the city council. No one appeared to oppose the rezonings at any of the four hearings. The city council unanimously adopted the EIR and approved the rezoning of the Koll/Tandem property on December 4, 1984, and the Sobrato property on February 5, 1985.

TRIP filed a petition for writ of mandate challenging each rezoning decision and the cases were consolidated. Demurrers were sustained without leave to amend as to two causes of action, one on the basis that the precise issue was pending before the court of appeal in TRIP 1. The case proceeded to trial on the remaining causes of action, and on December 15, 1986, judgment was entered against TRIP.

ISSUES

The focus of TRIP's concern about the proposed projects appears to be the effect development in Coyote Valley will have on water quality in the south bay area. In general TRIP argues that the proposed development will precipitate a need for a new sewage treatment plant, and that City did not fully consider the costs and benefits of this plant, both fiscally and environmentally.

More specifically, in its first argument, TRIP claims City violated Government Code section 65030.2 by failing to take into account the fiscal

implications of a new plant. Secondly, TRIP challenges the EIR claiming 1) the EIR did not adequately discuss the impact of the projects on the quality of south bay waters, and 2) City failed to give an adequate response to TRIP's letter commenting on the draft EIR.

TRIP makes two more points: first, that City's statement of overriding considerations was not supported by substantial evidence, and second, that the rezoning violated the Open-Space Lands Act. The first is patently unmeritorious. The second is precluded by operation of the doctrine of collateral estoppel.

### 1.  *Government Code Section 65030.2*

This section is a part of the general provisions of planning and zoning law set forth in title 7, division 1 of the Government Code. We quote it in its entirety: "It is further the policy of the state and the intent of the Legislature that land use decisions be made with full knowledge of their economic and fiscal implications, giving consideration to short-term costs and benefits, and their relationship to long-term environmental impact as well as long-term costs and benefits."

TRIP seizes upon the phrase "that land use decisions be made with *full knowledge* of their economic and fiscal implications," arguing that this language imposes a duty on the local agency to prepare and consider a financing plan for a new sewage plant prior to approving the rezoning.

TRIP analogizes the requirement expressed in Public Resources Code section 21061 and California Code of Regulations, title 14, section 15126[1] that an EIR be a "detailed statement" and that it contain discussion of "all phases of a project . . . [including] planning, acquisition, development and operation." These provisions are not analogous to Government Code section 65030.2. The Public Resources Code and accompanying Guidelines describe in particular what must be included in an EIR. Government Code section 65030.2, on the other hand, is a declaration of state policy and legislative intent in establishing the Office of Planning and Research. Section 65035 expressly provides: "It is not the intent of the Legislature to vest in the Office of Planning and Research any direct operating or regulatory powers over land use, public works, or other state, regional, or local projects or programs."

We have found no reported case which interprets section 65030.2 as anything other than a broad statement of legislative intent, and we must conclude that no cause of action arises under it.

---

[1] All California Code of Regulations sections will be referred to as Guidelines.

On a slightly different tack, TRIP argues that City must at the very least produce substantial evidence demonstrating compliance with this section. This is not the standard of review for zoning decisions. ■ Rezoning is a legislative act and is reviewable by ordinary mandamus under Code of Civil Procedure section 1085. (*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514, 522-525 [169 Cal.Rptr. 904, 620 P.2d 565].) Judicial review is limited to a determination whether a zoning decision is arbitrary or bears no reasonable relation to the public welfare. (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789 [161 Cal.Rptr. 260].) ■ TRIP does not contend that the decision is vulnerable when judged by that standard.

In the *Karlson* case appellant raised an argument similar to TRIP's, contending that another section of the Government Code, section 65300.5, be read as requiring a showing of substantial evidence to support a city's general plan amendment. As in our case, the statute at issue in *Karlson* was an expression of legislative intent.[2] The *Karlson* court rejected appellant's argument and we adopt its reasoning: "Certainly there is no direct language in the section which supports appellant's position. It is clearly a general statement of policy, and no one is arguing that it should not be considered in the execution of general plans and amendments thereto. But it is no more than that, and there is nothing to indicate a legislative intent that it modifies the applicable scope of review. The very reason for this limited review under Code of Civil Procedure section 1085 is to avoid the precise type of rigidity for which appellant argues by seeking to incorporate section 65300.5 in some mandatory fashion into the review. The judgment decision rests with the city council and will not be set aside unless the council acted arbitrarily, capriciously or without any evidentiary basis." (*Karlson* v. *Camarillo, supra,* 100 Cal.App.3d at pp. 800-801.)

Finally, regardless of the meaning and effect of Government Code section 65030.2, it cannot be said that City failed to consider the fiscal implications of expanding the existing sewage treatment plant. City and real parties in interest have cited numerous instances where the record contains such information. Moreover, a work plan, dated September 1984 and entitled "Future Capacity Planning for the San Jose/Santa Clara Water Pollution Control Plant" (hereafter the work plan), was prepared for the city council by the Departments of Planning and Water Pollution Control, and was incorporated into the first supplement of the EIR. This work plan includes a cost estimate and financing program for the expansion of the sewage treat-

---

[2] "In construing the provisions of this article, the Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (Gov. Code, § 65300.5.)

ment plant. The work plan will be discussed in greater detail in the following section.

## 2. *The EIR*

### *Sufficiency of Detail.*

■ TRIP returns to Public Resources Code section 21061 for the proposition that an EIR must provide "detailed information about the effect which a proposed project is likely to have," in this case the effect on south bay water quality as a result of increased discharge of treated sewage.

■ If an agency adopts an EIR which does not contain an adequate discussion of the environmental effects of a project, the agency "has not proceeded in a manner required by law." (Code Civ. Proc. § 1094.5; Pub. Resources Code, § 21168.5; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 355 [182 Cal.Rptr. 317].) Under the familiar rules of review in CEQA cases, courts "[d]o not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) The standard is expressed in Guideline 15151: "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure."

■ With this standard in mind, we turn to the information provided by the EIR regarding sewage treatment service. For the most part this is contained in the work plan referred to above. At the time of the rezonings the San Jose/Santa Clara Water Pollution Control Plant (the WPCP) had a capacity which was expected to accommodate growth in the cities it served for several years to come. City, by itself and by agreement with the Regional Water Quality Control Board (the RWQCB), engaged in continuous monitoring and analysis of wastewater flows in order to track growth and regularly update projections. These ongoing analyses of levels of service would be the basis for findings and recommendations on the timing for initiating a design process for additional wastewater treatment capacity. An implementation procedure for the construction of WPCP expansions is included in agreements executed by the cities of San Jose, Santa Clara and tributary

agencies. The agreements provide, among other things, that engineering studies shall begin when the plant has reached 85 percent of its design capacity. This is expected to occur some time in 1990. These studies shall include "an analysis of capacity needs, the size and nature of proposed facilities to be constructed, a construction timetable and an estimate of total project costs, and an estimate of each participating agency's share of project costs." Based on an historical growth rate, and the target date of 1990, the work plan developed a tentative schedule showing projected dates for implementation of the expansion plan. The first module of the expansion is expected to be operative in 1995 and to increase the capacity of the plant to serve its users until 2004, when a second module would be needed. Any expansion of the treatment plant would be subject to a full environmental review,[3] and would be required by state and federal law to comply with RWQCB standards.

The EIR provides information as to projected sewage flow to be generated by the first phase of the proposed projects, full development of the projects and cumulative impacts of all campus/industrial development in the North Coyote Valley. The availability of sewage treatment service at the existing plant will depend upon the timing of this development in relation to other development in the San Jose and Santa Clara areas. City ordinances prohibit any development approvals in excess of WPCP capacity and City has developed a careful plan of tracking development approvals and their sewage treatment demand to ensure that plant capacity will not be exceeded.

TRIP appears to take the position that the planned development in the Coyote Valley will in itself overtax the existing plant and precipitate a need for a new plant. On the contrary, the information contained in the EIR and work plan demonstrates that the expansion of the WPCP is contemplated and will be required in the course of steady growth with or without the proposed projects. Studies and projections are in progress, further studies are planned, and a tentative timetable is available. Meanwhile, water quality is protected by city ordinance and RWQCB standards. City is not obliged to speculate about effects which might result from violations of its own ordinances or water quality standards set by other agencies.

Lastly, the work plan discusses a Five-year Bay Water Quality and Biological Monitoring Program (the five-year study), the purpose of which is to conduct research and provide a report documenting the environmental impact on water quality from treated wastewater being discharged into the

---

[3] The record in fact contains a final EIR for the first stage expansion of the WPCP, dated July 1984. The Regional Water Quality Control Board participated in this review.

south bay. This study began in 1981 and at the time the EIR was approved was in its third year. The work plan reported that the conclusions drawn from the first two years showed "extremely positive results both in quality of the Bay waters and quantity and diversity of biological species." These results were attributed to the improved quality of the highly treated wastewater over the past several years. It was expected that the final three years would show even further improvement.

TRIP argues that City should have waited until the five-year study was complete before adopting the EIR and approving the rezonings. No purpose would have been served by this. In the worst scenario, if the five-year study had determined that discharge into the south bay was unacceptable, the south bay dischargers would be faced with the prospect of constructing a regional outfall and pumping facilities to transmit treated effluent to a deep water point north of Dumbarton Bridge. All indications at the time the EIR was adopted were that this would not be necessary. ■■■ Adoption of an EIR need not be interminably delayed to include results of works in progress which might shed some additional light on the subject. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) The sufficiency of an EIR as an informative document is judged "in light of what is reasonably feasible." (Guidelines, § 15151.)

■■■ We are satisfied that the EIR was sufficiently detailed in its discussion of the effect of the proposed projects on water quality. ■■■ It is unnecessary in an EIR to engage in sheer speculation as to future environmental consequences. (*Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 350-351 [194 Cal.Rptr. 203].) It would be unreasonable to expect this EIR to produce detailed information about the environmental impacts of a future regional facility whose scope is uncertain and which will in any case be subject to its own environmental review. The degree of specificity in an EIR need only correspond to the degree of specificity involved in the underlying activity which is described in the EIR, here the rezoning of two properties. (Guidelines, § 15147; *Atherton* v. *Board of Supervisors, supra,* 146 Cal.App.3d 346, 350-351.) ■■■ The information contained in the EIR provides a basis from which City could make a determination regarding the effect of the rezoning of these properties for industrial use on sewage treatment facilities and water quality. The EIR addressed the environmental concerns posed by the expansion of the WPCP and provided information to the extent it was available at the time. CEQA requires nothing more. (Guidelines, § 15151.)

*TRIP's Comment to the Draft EIR and City's Response.*

TRIP's comment to the EIR consisted of a letter submitted during the circulation of the first draft. City's response was contained in the first supplement to the EIR. As noted above, TRIP did not object to City's response to its comment at either the planning commission meeting or the city council meeting where such questions were open for discussion. Nor did it submit any written objections prior to these meetings. We are inclined to agree with City that the time for complaining about the inadequacy of City's responses was when the issue was before the agency and any alleged deficiency could be explained or corrected. (See, e.g. *Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855].) We do not decide on this basis, however, since we find that City's response was entirely adequate.

TRIP's letter comment contains a restatement of the complaint we have discussed in the preceding sections: namely, that the EIR did not provide adequate information regarding the economic, fiscal and long-term environmental effects which will be created by the sewage disposal needs of the proposed rezoning. City's response incorporated the work plan we have summarized above. As we have concluded, this information addresses the concerns posed by TRIP.

The letter also raises the question how the new sewage treatment plant would be financed. City's response noted that an EIR is not required to discuss economic effects (*San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584, 595; Guidelines, § 15131, subd. (a)), and referred TRIP to the work plan where financial projections and cost estimates are set forth in some detail.

Finally, TRIP's letter quotes from a "Report on City-Wide Infrastructure of the Horizon 2000 Task Force Subcommittee." According to TRIP, this report contains the following statement: " '[M]ore growth than is contemplated in the adopted General Plan will require an additional sewage treatment facility . . . [I]t is possible that this increase in the discharge of treated sewage would not meet RWQCB standards for acceptable cumulative impacts on South Bay water quality.' " The report itself is not attached and we are unable to locate it in the voluminous record of the administrative proceedings. We are therefore unable to evaluate this statement in context. Moreover, it appears that information contained in the report to the task force subcommittee would have been updated by the work plan, as well as the draft EIR for the first stage expansion of the plant. Based on the statement quoted, TRIP asks in its comment: "Will the increase in the

discharge of treated sewage created by this new plant meet RWQCB standards . . . ?" City's response refers again to information contained in the work plan and then says this: "Any new treatment plant would, like the City's present facility, be required by State and Federal laws to comply with the RWQCB standards and be subject to independent environmental review."

TRIP contends City's responses are conclusory. The relevant Guideline, section 15088, subdvision (b), explains that what is required of the responses is "good faith, reasoned analysis. . . . Conclusory statements unsupported by factual information will not suffice." City's draft EIR was sent to 40 individuals and organizations. Five, including TRIP, submitted comments. The comments and City's responses comprise a 12-page supplement to the draft EIR. A reading of these pages reveals that City responded to concerns in good faith, with reasoned analysis and by reference to source materials. Despite the fact that the responses are not exhaustive in some respects, we conclude that they adequately address issues raised. (See, e.g. *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 686 [188 Cal.Rptr. 233]; cf. *People* v. *County of Kern* (1974) 39 Cal.App.3d 830 [115 Cal.Rptr. 67].)

*Substantial Evidence to Support City's Statement of Overriding Considerations.*

■ If an agency approves a project in spite of identified adverse environmental impacts, it must explain, in written findings, that mitigation measures or environmentally sounder alternatives were not feasible, and that overriding considerations justify the project's approval. (Pub. Resources Code, § 21081; Guidelines, §§ 15091, 15093.) The findings must be accompanied by "a brief explanation of the rationale for each" (Guidelines, § 15091), and the statement of overriding considerations must be based on information contained in the record (Guidelines, § 15093, subd. (a)).

■ City's statement of overriding considerations referred to the conclusions contained in the final report of the economic development task force which was adopted by City in the course of amending the general plan. The statement further incorporated the final report itself as well as the findings City made when adopting the general plan amendment. It is entirely proper for an agency to rely upon studies and reports prepared for a previous step in the approval process. (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 392 [142 Cal.Rptr. 873]; *McMillan* v. *America Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 184-185 [131 Cal.Rptr. 462].)

The essence of City's statement of overriding considerations is that there exists in San Jose a need for large single-user quality industrial sites and that certain economic and environmental benefits would result from the development of the particular lands at issue for that purpose. TRIP claims there is no evidentiary support for the finding that there is a need for large single-user sites. On the contrary, the task force, after considering more than a dozen studies, surveys and inventories, reached the following conclusions: "[¶] III . . . There is an insignificant amount of vacant industrial land in large parcels (50+ acres) that is both desirable to high technology companies and available for purchase at acceptable prices . . . . [¶] IV . . . There appears to be no feasible way to significantly increase the supply of acceptable large high technology industrial sites in the Urban Service Area," and "[¶] . . . V . . . Edenvale and North Coyote Valley appear to be the most feasible areas to consider for expansion of the Urban Service Area to provide large parcels for high technology industry."

In the face of these conclusions, which were based upon an extensive fact-finding effort,[4] it is difficult to take seriously an argument which posits that there is *no* evidence to support a finding of need for high tech industrial sites. The evidence relied upon by TRIP is either outdated or nonexistent.[5] That is not even the point. We needn't consider conflicting evidence since the evidence supporting City's finding is substantial. In fact it is overwhelming.

City found that the reclassification and rezoning of these properties will lead to new jobs, a stronger tax base, and implementation of City's economic development goals. These findings are likewise supported by various studies prepared for the task force. Of course there are also sources documenting certain adverse effects of the rezoning, the obvious one being a loss of agricultural and open space land. City's decision to proceed, however, is a discretionary one, and will be upheld so long as it is based upon findings supported by information contained in the EIR. (*Residents Ad Hoc Stadium*

---

[4] Some of the studies considered by the task force and incorporated in the record were these: Market Analysis and Assessment of Land Availability for High Technology Industrial Development in San Jose (Sept. 1982), prepared by Williams-Kuebelbeck and Associates, Inc.; Projections of High Tech and Total Manufacturing Jobs in Santa Clara to 1990 (Apr. 1983), prepared by the Center for Continuing Study of the California Economy; Inventory and Analysis of Vacant Industrial Land (Feb. 1983), prepared by Arthur D. Little, Inc.; Coyote Valley Agricultural Study (Nov. 1982) prepared by Mundie & Associates.

[5] TRIP refers to studies made prior to, and thus superseded by, the task force effort. It also quotes the task force as having concluded that "the current inventory of vacant industrial land is meeting the economic needs for firms locating or expanding in San Jose." We are referred for this quote to a page in the administrative record which is blank. Finally TRIP offers mathematical calculations of its own creation to support a conclusion different from that of the task force.

*Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 287 [152 Cal.Rptr. 585]; Pub. Resources Code, § 21168.) There is not the slightest doubt that City's findings and statement of overrriding considerations are substantiated by the record here.

### 3. *Violation of Open-Space Lands Act*

In TRIP 1 the argument was raised that City's amendment to the general plan, which redesignated the subject parcels for campus/industrial use, constituted a violation of the Open-Space Lands Act (OSLA). The trial court denied a writ of mandate and the First District affirmed the judgment, expressly rejecting TRIP's argument:

"Examination of the Open-Space Lands Act demonstrates that it does not treat the open-space land classifications (one of which is agricultural) as immutable. One of the Act's purposes is the discouragement of 'premature and unnecessary conversion of open-space land.'" (Gov. Code, § 65561, subd. (b).) This statutory language clearly contemplates that some conversions can be necessary and the result of mature deliberation. Numerous other statutes explicitly recognize and regulate the amendment of general plans. (See, e.g. Gov. Code, §§ 65350-65359.) The reality of reclassification is further accepted by the Act's directive that the state Director of Conservation "collect or acquire information on the amount of land *converted* to or *from agricultural use.* . . ." (Gov. Code, § 65570, subd. (b), italics added.) The only restriction on a general plan amendment is that the legislative authority "deems it to be in the public interest . . . ." (Gov. Code, § 65358, subd. (a).) The question of whether defendant's actions satisfied this criterion has already been discussed. *No conflict between those actions and the Open-Space Lands Act has been shown.* [Citation.]" (*Towards Responsibility in Planning* v. *City Council, supra,* A029610, italics added.)

■ TRIP's petition for writ of mandate in the instant action raised precisely the same challenge to the rezoning. The trial court sustained a demurrer pursuant to Code of Civil Procedure section 430.10 on the basis that "another action [was] pending between the same parties on the same cause of action." TRIP then amended its petition, omitting the cause of action based upon OSLA, and one other, and the matter proceeded to trial on the remaining causes. On appeal TRIP now asks us to consider the merits of its OSLA claim. This we decline to do. In the first place, the trial court did not address the merits. More importantly, the issue was fully litigated and decided in TRIP 1.

We are aware that TRIP 1 involved a general plan amendment whereas the action before us challenges a rezoning. We agree with City that this

makes no difference, either as to the correctness of the ruling on the demurrer or the operation of collateral estoppel. Both zoning and general plan amendments are legislative acts. Both resulted here in applying the same designation to identical properties. It is common knowledge that a general plan amendment will be followed by and implemented through rezoning of the designated properties. In this case the rezoning in conformance with the general plan followed within 18 months. The conclusion is inescapable that the issue sought to be litigated here is identical to that decided by TRIP 1: whether the redesignation of agricultural lands to industrial use, which is otherwise a valid legislative act, constitutes a violation of OSLA. The decision of the Court of Appeal operates as a conclusive adjudication of that issue. (*Lockwood* v. *Superior Court* (1984) 160 Cal.App.3d 667, 671-672 [206 Cal.Rptr. 785].)

Judgment is affirmed.

Agliano, P. J., Capaccioli, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 22, 1988.