[No. H004754. Sixth Dist. Oct. 17, 1989.]

SCHAEFFER LAND TRUST, Plaintiff and Appellant, v.
SAN JOSE CITY COUNCIL et al., Defendants and Respondents;
CB & CB DEVELOPMENT CORPORATION et al., Real Parties in
Interest and Respondents.

**COUNSEL**

Terry D. Graff and Wool, Richardson & Graff for Plaintiff and Appellant.

Joseph P. DiCiuccio, Howell & Hallgrimson, Joan R. Gallo, City Attorney, and George Rios, Assistant City Attorney, for Defendants and Respondents.

Richard T. Tarrant, Michael D. Abraham, Bartko, Welsh, Tarrant & Miller and Robert L. Mezzetti for Real Parties in Interest and Respondents.

**OPINION**

**PREMO, J.**—Schaeffer Land Trust (hereafter, Schaeffer) appeals from an adverse judgment on its petition for a writ of mandate and complaint for injunctive relief. Schaeffer seeks to set aside two amendments to the general plan of the City of San Jose (hereafter, City) adopted by the San Jose City Council (hereafter, City Council). It primarily argues that the California

Environmental Quality Act (CEQA)[1] requires preparation of an environmental impact report (hereafter, EIR) rather than a negative declaration for the amendment pertaining to property referred to as the golf course and that the EIR prepared for use in considering the amendment pertaining to property referred to as the school is inadequate because it fails to study the cumulative effect of traffic which would result from both amendments. ▮▮▮▮ Schaeffer secondarily argues that the amendments are invalid because they violate City's general plan, transgress CEQA's critical threshold for health and safety (§ 21000, subd. (d)), and were adopted without compliance with a duty under Government Code section 65030.2 to prepare a cost/benefit study.[2] The real parties in interest are the developers and landowners of the golf course and school properties.[3] None of Schaeffer's claims has merit. We therefore affirm the judgment.

## CEQA POLICY AND STANDARD OF REVIEW

A short summary of the purpose and rationale of the CEQA review process is in order.

CEQA was enacted to preserve and enhance the natural environment of this state by establishing procedures to "[e]nsure that the long-term protection of the environment . . . shall be the guiding criterion in public decisions." (§ 21001, subd. (d).) To ensure this goal, the statutes and Guidelines provide a vehicle for compelling public agency decision makers to document and consider the environmental implications of their actions. (§§

---

[1] Public Resources Code section 21000 et seq. Unless otherwise specified, all further statutory references are to the Public Resources Code. References to the "Guidelines" throughout this opinion are to CEQA Guidelines, promulgated by the State Resources Agency, contained in California Code of Regulations, title 14, section 15000 et seq.

[2] We address these points because they appear under an appropriate heading separately in Schaeffer's opening brief and are generally descriptive of the subject matter covered. (Cal. Rules of Court, rule 15.) Interwoven throughout Schaeffer's statement of facts in its opening brief are general complaints about the administrative proceedings. For example, Schaeffer states in this portion of its opening brief: "As to the significance of this omission and the practical importance of correcting it, . . . [c]learly, the City does not have all of its predictions for this intersection under control . . . ." Another example: "The seemingly incorrect enlargement over time of this critical volume increase . . . is one of several troubling inconsistencies in the City's data, requiring further study to establish the correct facts regarding traffic at this critical intersection." We do not address claims interwoven in a statement of facts unless they are discussed under an appropriate heading. "A point which is merely suggested by appellant's counsel, with no supporting argument or authority, is deemed to be without foundation and requires no discussion." (*In re Steiner* (1955) 134 Cal.App.2d 391, 399 [285 P.2d 972].)

[3] In addition to City, we have received a respondent's brief from CB & CB Development Corporation, Carl Berg, and Clyde Berg (hereafter, collectively, Berg), from Ray Collishaw, and from William Marocco. CB & CB Development Corporation initiated the request for the golf course amendment. Carl Berg and Clyde Berg are owners of approximately 33 acres of the golf course property. Collishaw and Marocco are owners of the school property.

21000, 21001; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 254-256 [104 Cal.Rptr. 761, 502 P.2d 1049].) The EIR is the "heart of CEQA." (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) ■ "In general terms the EIR process provides for extensive research and information gathering, consultation with other state, federal and local agencies and with persons or organizations directly concerned, public review and comment, evaluation and response to comments, and detailed findings. . . . The EIR is 'an environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return' [citation], and 'to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action.' [Citation.]" (*City of Carmel-By-The-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 241 [227 Cal.Rptr. 899].)

CEQA requires local agencies to prepare an EIR on any project "which may have a significant effect on the environment." (§ 21151.) ■ If an activity is a project as defined by CEQA and not otherwise exempt from CEQA, the agency must conduct an initial study to determine whether the project may have a significant effect on the environment. (*City of Carmel-By-The-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at p. 240.) There are two possible results of the initial study. If the agency determines that there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment it must prepare an EIR. If, on the other hand, the agency perceives no substantial evidence that the project or any of its aspects may cause a significant effect on the environment, the agency may prepare a negative declaration.[4] (*Id.* at p. 241.)

 ■ "At this juncture, we think it important to emphasize that the task of the judiciary is not to question the wisdom of proceeding with a project. Our purpose in reviewing environmental decisions is not to pass upon the correctness of a public entity's conclusions, but only upon the sufficiency of an EIR or negative declaration as an informative document. [Citations.] In so doing, we look to see whether policymakers have been adequately informed of the consequences of their decisions, and whether the public has sufficient information to evaluate the performance of their elected officials." (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 259 [232 Cal.Rptr. 772].)

Judicial review of agency decisions under CEQA is governed by section 21168 (for review of decisions "made as a result of a proceeding in which by

---

[4] "Significant" in this context covers a spectrum of meanings " 'ranging from "not trivial" through "appreciable" to "important" and even "momentous." ' [Citation.]" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 83, fn. 16 [118 Cal.Rptr. 34, 529 P.2d 66].)

law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . .") and by section 21168.5 (for review of decisions "[i]n any action or proceeding, other than an action or proceeding under Section 21168 . . .").[5]

Before adopting or amending a general plan, a legislative body is required to hold at least one public hearing. (Gov. Code, § 65355.) ▇ Thus, section 21168 dictates the correct standard of review for this case. (*City of Carmel-By-The-Sea* v. *Board of Supervisors, supra,* 83 Cal.App.3d at p. 239.)

Section 21168 provides that "Any action or proceeding to attack [or] review . . . [a] decision of a public agency . . . on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." Code of Civil Procedure section 1094.5, subdivision (b), permits inquiry in a case subject to its provisions to questions "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."[6]

▇ In a case where the question is whether an EIR should have been prepared rather than a negative declaration, the court's function is to uphold the decision if substantial evidence supports a conclusion that it cannot be fairly argued on the basis of substantial evidence that the project may have significant environmental impact. (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514].) However, "If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration . . . ." (*Ibid.*)

---

[5] The adoption of a general plan or amendment to a general plan is a legislative act generally reviewable under ordinary mandamus where the question is whether the adoption was arbitrary or capricious or totally lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices required by law. (Gov. Code, § 65301.5; *City of Carmel-By-The-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at pp. 238-239.)

[6] In the CEQA context, substantial evidence is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).)

■ In a case where the question is the adequacy of an EIR, the court's function is to uphold the decision unless there has been an abuse of discretion (Code Civ. Proc., § 1094.5, subd. (b)) or the decision is not supported by substantial evidence (§ 21168; Code Civ. Proc., § 1094.5, subd. (b)). If an agency adopts an EIR which does not contain an adequate discussion of the environmental effects of a project, the agency has not proceeded in a manner required by law and, thus, has abused its discretion. (*Towards Responsibility in Planning* v. *City Council* (1988) 200 Cal.App.3d 671, 679 [246 Cal.Rptr. 317].)

■ We note that our duties are identical to those of the trial court as we occupy, in essence, identical positions exercising the appellate function of determining whether the administrative record is free from legal error. Thus, we conduct our own independent review and the conclusions of the superior court and its disposition of the issues in this case are not conclusive on appeal. (*City of Carmel-By-The-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at p. 239; *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 260.)

With these criteria and Schaeffer's contentions in mind, we review the administrative records.[7]

## GOLF COURSE BACKGROUND

The site of the former Cambrian Golf Course consists of approximately 79 acres on the northwest corner of Branham Lane and Union Avenue. The West Valley Transportation Corridor, designated for construction of state Highway 85, cuts across the golf course so that the site is, in reality, two parcels with an approximate net acreage of 56. In 1983, City rezoned this property to permit the land to be used as an industrial park. This use was consistent with City's general plan as amended in December 1982. In making its decision to rezone the land, City relied upon an EIR. The EIR indicated that Berg proposed to develop the golf course into an industrial park in three phases over three years. The EIR included a study of the proposal's traffic impacts.

After developing approximately 47 percent of the site, Berg desired to include retail, office, and residential uses in the balance of the development.

---

[7]There are two administrative records in this case, i.e., one for each amendment to City's general plan. Berg objects to Schaeffer's tactic of joining review of two administrative proceedings into one judicial proceeding on the basis the tactic is designed to create confusion by permitting Schaeffer to cross-reference evidence. Since we agree with Berg that Schaeffer's arguments fail even if the proceedings are jointly reviewed, we do not address Berg's objection further.

In 1986, it requested an amendment to City's general plan to add a mixed use overlay to the industrial park land use designation. City deferred action on the request until 1987 to permit Berg sufficient time to provide a traffic study. In a letter to Berg, City explained: "If this traffic report identifies significant environmental impacts on the City's transportation network, it will be necessary for you to prepare an [EIR]. . . . [¶] [ ] The traffic report must analyze both the short and long-term (Year 2000) conditions resulting from this development. Your consultant will also have to compare the analysis for the amendment request with the analysis completed by Mr. Louis Larson for the [previous EIR]. This comparison must include the difference in traffic impacts between the approved zoning and the proposed amendment."

Berg submitted its traffic study to City in July 1987. The report described its analysis as follows: "First, operating characteristics of the existing roadway network serving the proposed site are reviewed. Roadway conditions are then reevaluated under near term conditions which first assume completion of other approved projects alone and buildout of the site as currently zoned then assuming the proposed General Plan Amendment and rezoning. Next, completion of the General Plan Amendment and rezoning assuming long term conditions with Route 85 constructed (Year 2000) are evaluated." The analysis followed City's level of service (hereafter, LOS) criteria.

An LOS analysis is a standardized method of rating the operating characteristics of an intersection. An LOS is a qualitative description of an intersection's quality of operation based upon delay and maneuverability. An LOS can range from A, representing free flow conditions, to F, representing jammed conditions. City defines a traffic impact as being significant if project traffic (1) reduces an LOS below D, or (2) increases the critical volume by one or more percent in cases where the intersection is already operating at an LOS E or F.

Berg's traffic study concluded that there would be no significant long-term impacts from the proposed amendment and only one short-term impact at the intersection of Camden Avenue and Union Avenue. The report noted that the intersection currently operated at LOS D. However, when all projects affecting the intersection previously approved by City were considered, the intersection's operation was LOS E. While the proposed amendment did not affect the intersection's LOS, it did increase the intersection's critical volume by 1.2 percent. The report attached a market study which indicated that the proposed retail uses of the proposed development would decrease the intersection's traffic by capturing shoppers traveling northbound on Union Avenue to markets north of Camden Avenue.

City's planning department reviewed Berg's report and concluded that the Camden/Union short-term traffic impact could be mitigated by restriping the north approach to the intersection to have two left turn lanes, one through lane, and one shared through/right turn lane, and by adding an additional left turn lane at the south approach. The department concluded "that the proposed General Plan Amendment would be in conformance with the Transportation Level of Service Policy (Council Policy 5-3) and that a determination for a Negative Declaration can be made with respect to traffic impact."[8]

City adopted the negative declaration on August 31, 1987, and amended its general plan consistent with Berg's application after a public hearing held on November 17. The negative declaration states, in pertinent part: "A traffic report prepared for this proposal identifies that long term traffic capacity is available to serve this proposal. Any future development of this site will be in conformance with the City's General Plan Transportation Level of Service Policy. [¶] [ ] This Negative Declaration covers only the request for a General Plan Amendment. Any subsequent development proposals for the subject site will require additional environmental review."

*Discussion*

 Schaeffer initially contends that the golf course amendment will cause traffic LOS to "sink" from D to E or F at four intersections, Camden/Union, Bascom/Camden, Blossom Hill/Camden, and Blossom Hill/Union. Schaeffer refers us to page 441 of the administrative record which is a table prepared by City's planning department detailing the results of Berg's near-term traffic analysis of 15 signalized intersections in the vicinity of the golf course during the evening peak-hour commute period.

The table reveals that each intersection currently operates at LOS D. However, the intersections were projected to operate at LOS E, E, D, and F, respectively, when previously approved projects were considered. When Berg's proposal was considered with the previously approved projects, the intersections were projected to operate at LOS E, E, E, and F, respectively. ██ Thus, only the Blossom Hill/Camden intersection was projected to be significantly impacted in the near term by Berg's proposed amendment to the general plan.[9]

---

[8] The CEQA process permits issuance of a negative declaration where potentially significant environmental effects are identified but are mitigated by project revisions to a point where no significant effects would occur. (§ 21080, subd. (c); Guidelines, § 15070.)

[9] City and Berg assert that the table is inaccurate in this respect and refer us to a declaration filed with the trial court which supports this assertion and explains that the inaccuracy was not addressed at the administrative level because City does not rely upon near-term

 City and Berg urge that the near-term traffic analysis in this case was meaningless because Berg's project was not at the development stage and the negative declaration reserved the issue of compliance with City's LOS policy to future environmental review. We agree.

"Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004, subd. (b).)

A general plan is by its very nature merely tentative and subject to change. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 278 [118 Cal.Rptr. 249, 529 P.2d 1017].) It represents a conceptual proposal. (*Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 351 [194 Cal.Rptr. 203].)

CEQA recognizes that environmental studies in connection with amendments to a general plan will be, on balance, general. Guidelines section 15146 provides: "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR. [¶] (a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy. [¶] (b) An EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow."

Here, the golf course amendment simply will not have a significant impact upon traffic. The study indicates such over the long term, and City indicates such over the near term because the negative declaration makes clear that a specific development will require future environmental review and will not be approved unless it conforms to City's LOS criteria. Thus, the near-term traffic analysis performed in this case identifies an impact

traffic analyses to identify significant environmental effects of traffic at the general plan approval stage. However, in an administrative mandamus action, appellate review is limited to issues in the record at the administrative level. (*City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1021 [162 Cal.Rptr. 224].) Additional evidence is admissible only where it was unavailable at the time of the administrative hearing, or improperly excluded from the record. (Code Civ. Proc., § 1094.5, subd. (e).)

which will be mitigated at a subsequent stage of development. The near-term analysis does not provide meaningful information for environmental assessment at the general plan stage. At most, it may serve to influence the ultimate project's program and design. However, it simply does not describe a specific environmental effect that can be expected to follow from adoption of the golf course amendment to City's general plan. The reality is that City's decision to adopt the golf course amendment has no traffic consequences. The decision leads City not one step closer to an ecological point of no return.

Therefore, there is no substantial evidence to support a fair argument that the adoption of the golf course amendment to City's general plan may have a significant environmental effect.[10]

Our conclusion is analogous to the one reached in *Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851 [139 Cal.Rptr. 176]. There, the court rejected a challenge to an EIR prepared in connection with an application for exploratory geothermal drilling. The EIR did not assess the effects of commercial development in the event that geothermal resources were encountered. The court observed that discovery of the resources was speculative and the EIR itself stated that if resources were discovered a very comprehensive EIR would be required prior to commercial development. It reasoned: "The foregoing facts make clear that there is no danger that the county's present approval of exploratory drilling will serve as a hindrance to future intelligent decision-making with respect to the environmental consequences of commercial geothermal development . . . ." (*Id.* at p. 857.)

Schaeffer replies that such a conclusion is inconsistent with *City of Carmel-By-The-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d 229, 250, in which we stated: "The fact that the environmental consequences of a rezoning may be more amorphous than those flowing from a precise development plan does not compel the conclusion that no EIR is required. . . . Thus the difficulty of assessing future impacts of a zoning ordinance does not excuse preparation of an EIR; such difficulty only reduces the level of specificity required and shifts the focus to the secondary effects."

We disagree. In *City of Carmel-By-The-Sea* the principal issue was where the boundary line for a wetlands area should be drawn. There existed

---

[10] Schaeffer secondly contends that the cumulative impact of the golf course amendment and the school amendment will increase the critical volume at the Camden/Leigh intersection by 1.2 percent. However, Schaeffer again relies upon the table detailing the results of Berg's traffic analysis for the near term. The table shows that the golf course amendment will increase the critical volume at this intersection by 0.6 percent. Schaeffer argues that the school amendment will also increase the critical volume at this intersection by 0.6 percent. Our determination concerning the utility of the near-term traffic analysis is determinative here.

substantial disagreement among the experts regarding the size of the wetlands. The county nevertheless adopted a negative declaration and then adopted an ordinance rezoning property which included the wetlands and a resort hotel. The effect of the zoning ordinance was to authorize expansion of the hotel to accommodate residential cluster development and to finally define the boundaries of the wetlands area. The effect of the negative declaration was to terminate environmental review on the subject of rezoning. In this context, we rejected the arguments that environmental impacts were too speculative to render an EIR at the zoning stage feasible and an EIR at the development stage would adequately address environmental issues.

SCHOOL BACKGROUND

The site of the former Camden High School consists of approximately 45 acres on the northwest corner of Camden Avenue and Union Avenue. The property is approximately 2,500 feet north of the golf course. In 1986, City's general plan permitted use of the school for public/quasi-public purposes and it was leased to a private high school and to the San Jose Community College District. The Campbell Union High School District owned approximately 12 acres of the site and maintained its district offices thereon. In June 1986, Marocco and Collishaw applied to amend City's general plan to permit the property to be used for administrative offices/research and development and public park/open space purposes. Marocco and Collishaw did not have a precise development plan other than one consistent with the general plan's description of the proposed use.

City prepared a draft EIR for the project and solicited comments and suggestions from other public agencies and the public at large. The environmental effects of traffic from the proposed project was a principal issue discussed in the draft. A traffic study analyzed traffic conditions at 14 critical intersections in the vicinity of the school under existing conditions and 11 development scenarios.

We quote the following comment, dated August 2, 1986, from Garnetta J. Annable, president of Cambrian Village Homeowners Association, as an example of those received by City: ". . . San Jose has significant regional traffic congestion problems in [the] region of the Camden High School Site which effect [sic] not only residents in the immediate vicinity of the Site, but residents and commuters from South San Jose. Completion of the 85 Corridor appears to be the only mitigation which will bring some relief of the regional traffic problems. [¶] In view of the regional traffic problems and the severe degradation of traffic services which will occur by development of the Camden School Site, we oppose *any* land use change of the Camden High School Site until the 85 Corridor is completed."

In September 1986, an addendum to the traffic study analyzed traffic conditions at eight additional existing intersections and one future intersection (Highway 85 and Bascom Avenue) under existing conditions and thirteen development scenarios.

The EIR was scheduled to be considered by City's planning commission on September 17, 1986; however, Marocco and Collishaw elected to have another development alternative analyzed. The hearing was then set for October 15. In the interim, additional intersections were analyzed as well as the development alternative. In a memorandum to the planning commission dated October 14, City's director of planning stated: "The primary development constraint for the Camden High School site is traffic. Based on the Traffic Analyses . . . the [EIR] concludes that *none* of the non-residential alternatives for the *entire* 33± acre site could meet the City's Transportation [LOS] Policy, now or by the year 2000."

City's planning commission found the EIR complete on October 15, 1986. The EIR consisted of the draft, a revised draft and the first and second amendments, consisting of comments, responses and text revisions. The school amendment was set to be heard by City on November 18; however, at the request of Marocco and Collishaw, City deferred the matter for a year.

On June 17, 1987, Marocco and Collishaw revised their proposal and requested a general plan amendment which would permit the school to be used for high density residential on 11-12 acres, neighborhood community commercial on 11-12 acres, and private recreation and/or public park and open space on approximately 10 acres. A draft supplemental EIR was prepared which included another traffic study. This study analyzed traffic conditions at 13 critical intersections in the vicinity of the school under existing conditions, existing plus approved projects conditions, existing plus approved projects conditions plus project traffic conditions, year 2000 background conditions, and year 2000 background plus project traffic conditions.[11]

City's general plan is known as Horizon 2000 and the traffic analyses in the EIR and supplemental EIR were based on the assumptions included in Horizon 2000 and TRANPLAN, City's computerized transportation model. TRANPLAN is updated regularly in order to reflect changing conditions and its accuracy is considered to be adequate for forecasting within the Horizon 2000 time frame.

---

[11] The supplemental EIR did not discuss 12 intersections which the previous EIR indicated were not significantly impacted by the school amendment under any of the development scenarios.

The traffic study for the draft supplemental EIR states: "Existing and future land-use data were collected to provide a picture of current and projected development in the area. Existing evening peak-hour traffic volumes for the critical intersections were obtained from the City of San Jose. Intersection lane configurations were determined through field reconnaissance." The study explained how it evaluated existing plus approved projects conditions as follows: "The Approved Trip Inventory from the city was added to the existing traffic volumes and subsequent intersection level of service calculations were performed."

Comments and suggestions were received by City and responses were given. Marocco and Collishaw then reduced the residential use of their proposal to medium high density. City considered the school amendment at the same public hearing it heard the matter of the golf course amendment. At the hearing, many favorable comments were made about the school amendment, including the following by Garnetta Annable: "I'd like to thank the planning department; the staff has answered all my questions over the last two years and I really feel that, when they were working with Mr. Collishaw and Mr. Morocco [*sic*], that they were looking to find an equitable land use that we could live with and that who would hopefully invite the developer to work with the City to acquire a Park. I'd like to thank Councilman Beall; he's been in the hot seat, he's got some really bad press. I'd like to thank Ray Collishaw and Bill Morocco [*sic*] for meeting with the neighborhood association and for making it easy for us to go with them, with pictures in hand of our children playing on the field, and that they have recognized that we do need a park here and that, by dividing this use of the land, we have saved one-third for the people; we have one third that will give you tax revenues to provide for the people; and left them some room to make a reasonable return on their investment. And I'd just like to thank everyone that's been involved in it."

City approved the EIR which consisted of the original EIR and supplemental EIR. It then amended its general plan consistent with the revised application submitted by Marocco and Collishaw. The written resolution noted that the project would increase traffic volumes by more than 1 percent, in the near term, at seven intersections which currently operate at LOS D or E, but found that the project would meet City's LOS policy in the long term. The resolution provided: "Development of this project cannot proceed until such time as the LOS Policy is met at the seven impacted intersections, therefore, this impact is seen to be adequately mitigated."

*Discussion*

The guidelines require that an EIR discuss cumulative impacts when they are significant. (Guidelines, § 15130.) ▮▮▮ "The purpose of this require-

ment is obvious: consideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment." (*Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 306 [223 Cal.Rptr. 18].) A cumulative impacts analysis includes a consideration of projects under environmental review in addition to approved projects. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 72-74 [198 Cal.Rptr. 634].)

 Schaeffer's contention that the school EIR failed to study the cumulative traffic effect of the school and golf course amendments is inconsistent with the following statement contained in section III of the supplemental EIR entitled "Cumulative Impacts": "This report had addressed the environmental impacts of the proposed General Plan Amendment. The potential impacts resulting from the project are primarily site specific. However, when development of the Camden site is considered in combination with existing, approved, and proposed developments in the vicinity, cumulative impacts could arise." It is also inconsistent with the first amendment to the EIR containing the comments, responses, and text revisions to the draft EIR. The amendment recorded the following comment received from Cambrian Village Homeowners Association on August 21, 1986, and response: "*Comment*: Do the approved projects include traffic projects from the . . . latest proposals from the Cambrian golf course? [¶] *Response*: These projects were included in the traffic analysis."

Schaeffer argues the above statements are conclusional and inconsistent with the statement in the supplemental EIR traffic study which indicated that its analysis of the critical intersections in the vicinity of the school considered existing conditions, existing plus approved projects conditions, existing plus approved projects conditions plus project traffic conditions, year 2000 background conditions, and year 2000 background plus project traffic conditions. Schaeffer correctly points out that this statement necessarily excludes the golf course amendment which was then under environmental review.

Schaeffer's argument tacitly concedes that the school EIR studied the cumulative traffic impact of the school amendment and the golf course property's approved use as an industrial park as distinguished from its partial use as an industrial park and partial use consistent with a mixed use overlay. We conclude such a study is an adequate discussion of the cumula-

tive effects of the two projects under the circumstances of this case. We therefore do not address the question raised by the inconsistencies.

"The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness." (Guidelines, § 15130, subd. (b).) ▆▆ " 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' [Citations.]" (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 429 [222 Cal.Rptr. 247].) "Under CEQA, the agency must consider the cumulative environmental effects of its action before a project gains irreversible momentum." (*City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1333 [232 Cal.Rptr. 507].)

▆▆ Even without Schaeffer's implicit concession, it is evident from the record, which we have only summarized briefly, that the school EIR comprehensively, if not perfectly, analyzed the issue of traffic. This is the case, even though the project at issue and the golf course project are amendments to a general plan and are therefore at a stage where development is conceptual. Nevertheless, City's approval of each project specified that traffic issues would undergo further environmental review. Thus, cumulative impacts existing at subsequent stages of development of each project will be addressed and will be actual rather than conceptual. As a practical matter, a study of actual cumulative impacts has more utility than a study of conceptual cumulative impacts. Moreover, Schaeffer's claimed deficiency of the cumulative impacts analysis is not a complete failure to consider the traffic impacts of the school amendment plus the golf course project and/or other closely related projects. It is merely a complaint that the school EIR omitted consideration of the traffic impacts of the school amendment plus a proposed partial change in the use of the golf course.

Schaeffer relies upon *San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* 151 Cal.App.3d 61. However, that case is distinguishable because the magnitude of the omissions in the cumulative impacts analyses rendered the analyses gravely inaccurate and the effect of the agency's approvals was to give the projects under consideration irreversible momentum. There, the San Francisco Planning Commission certified EIR's on four high-rise office buildings and issued construction permits. The cumulative impacts analyses of the EIR's discussed approved, but not yet constructed, projects and projects under construction. However, they

did not discuss projects currently under environmental review though they acknowledged the existence of such projects. The EIR's thereby understated the amount of related new development in downtown San Francisco. The court used one of the EIR's as an example and observed: "In the draft and the final EIR, the Commission acknowledged 16.2 million square feet of new development, but analyzed only 6.3 million. In this case, therefore, the Commission's analysis left out nearly 60 percent of the total amount of related development. . . . An omission of such magnitude inevitably renders an analysis of cumulative impacts inaccurate and inadequate because the severity and significance of the impacts will, perforce, be gravely understated." (*Id.* at pp. 77-78.)

We cannot conclude that the school EIR is inadequate on the basis it reserved discussion of one conceptual cumulative impact to a time when the severity of the impact and its likelihood of occurrence will be known more specifically. (Cf. *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles, supra,* 177 Cal.App.3d at p. 307 ["Agencies are encouraged by the guidelines to tier their EIRs to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."]; *Towards Responsibility In Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 681 ["It would be unreasonable to expect this EIR to produce detailed information about the environmental impacts of a future regional facility whose scope is uncertain and which will in any case be subject to its own environmental review."].)

We also reject Schaeffer's secondary contention made in its reply brief that the cumulative impacts analysis in this case was inadequate because it failed to comply with Guidelines section 15130. Subdivision (b) of that section provides: "The following elements are necessary to an adequate discussion of cumulative impacts: [¶] (1) Either: [¶] (A) A list of past, present, and reasonably anticipated future projects producing related or cumulative impacts . . . or [¶] (B) A summary of projections contained in an adopted general plan or related planning document which is designed to evaluate regional or areawide conditions. Any such planning document shall be referenced and made available to the public at a location specified by the lead agency; [¶] (2) A summary of the expected environmental effects to be produced by those projects with specific reference to additional information stating where that information is available, and [¶] (3) A reasonable analysis of the cumulative impacts of the relevant projects. . . ."

 "[T]he guidelines are not strict standards but rather 'are indications or outlines to be followed, allowing for flexibility of action and conduct of governmental agencies faced with what are frequently complex and difficult decisions which could affect the environment. They are distinguish-

able from standards which frequently require a rigid and precise application according to legislative intent. The guidelines themselves make this clear. . . . The guidelines have only general application to the diversity of projects undertaken or approved by public agencies. . . . Even where specific guidelines have been urged upon the courts as requiring a narrow and restricted approach by the governmental agency, the courts have followed the general tenor of the guidelines, indicating that they are subject to a construction of reasonableness and the court will not seek to impose unreasonable extremes or to inject itself within the area of discretion as to the choice of action to be taken. [Citation.]' [Citation.]" *(Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles, supra,* 177 Cal.App.3d at p. 306, fn. 1.)

 In grounding its projections upon Horizon 2000 and TRAN-PLAN, the traffic report necessarily summarized their contents which necessarily identified and summarized the environmental effects of related past, present, and probable future projects. That the analysis has no "list" of projects or fails to specifically identify the golf course project does not render the analysis inadequate.

### GENERAL PLAN VIOLATION

There is a section in Horizon 2000 entitled "Goals and Policies." One provision in this section states: "The minimum overall performance of City streets during peak travel periods should be [LOS] 'D'."

 Schaeffer next contends that the golf course amendment is invalid because the LOS analysis shows that four intersections will slip from LOS D to a lower level and the school amendment is invalid because the development proposal admits that it does not meet City's LOS policy.

This contention is patently unmeritorious.

On its face, the Horizon 2000 provision quoted above is a goal and policy rather than a strict standard. It therefore does not follow that an amendment to Horizon 2000 which does not strictly conform to the policy is invalid for that reason. "The judgment decision rests with the city council and will not be set aside unless the council acted arbitrarily, capriciously or without any evidentiary basis." *(Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 801 [161 Cal.Rptr. 260].) Schaeffer makes no attempt to carry its burden of proof on this type of issue.

Moreover, it could not prevail on this issue since we have previously observed that City's long-term traffic capacity is projected to be able to

serve both projects in conformity with City's LOS policy and that any specific development of either site will not be approved unless the LOS policy will be maintained. City's action represents the very essence of informed and reasoned decision making.

### CRITICAL THRESHOLD

■ Schaeffer next argues that the golf course and school amendments are invalid because they transgress section 21000, subdivision (d).

Section 21000 is entitled "Legislative intent." Subdivision (d) of this section provides: "The capacity of the environment is limited, and it is the intent of the Legislature that the government of the state take immediate steps to identify any critical thresholds for the health and safety of the people of the state and take all coordinated actions necessary to prevent such thresholds being reached."

Schaeffer claims City has failed to establish a critical threshold for health and safety as to traffic circulation or, if LOS D is the critical threshold, the amendments violate this threshold because they will create traffic conditions worse than LOS D.

Expressions of legislative intent or policy should be considered in acting upon general plans and amendments thereto. (*Karlson* v. *City of Camarillo, supra,* 100 Cal.App.3d at pp. 800-801; *Towards Responsibility In Planning* v. *City Council, supra,* 200 Cal.App.3d at pages 677-678.) However, such statutes do not give rise to a cause of action absent language to the contrary demonstrating that the Legislature intended to modify the applicable scope of review. (*Ibid.*) Certainly, there is no language in section 21000 which supports Schaeffer's position.

### COST/BENEFIT STUDY

■ Schaeffer finally contends that the amendments are invalid because City contravened Government Code section 65030.2 by failing to prepare a "cost/benefit study." This section provides: "It is further the policy of the state and the intent of the Legislature that land use decisions be made with full knowledge of their economic and fiscal implications, giving consideration to short-term costs and benefits, and their relationship to long-term environmental impact as well as long-term costs and benefits."

We specifically rejected the proposition that a cause of action could be stated under Government Code section 65030.2 in *Towards Responsibility In Planning* v. *City Council, supra,* 200 Cal.App.3d at pages 677-678. We

agree with the conclusion in that case. No purpose would be served by repeating the reasoning here.

The judgment is affirmed.

Capaccioli, Acting P. J., and Elia, J., concurred.